## NOTICE: SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,

Respondent,

v.

JASON MICHAEL RAMOS,

Appellant.

No. 82818-5-I

DIVISION ONE

PUBLISHED OPINION

ANDRUS, C.J. — After a 2015 conviction for first-degree assault with a deadly weapon and first-degree robbery,[1] Jason Michael Ramos was resentenced in 2021 after a prior drug possession conviction was invalidated by *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021). At resentencing, the trial court affirmed a prior restitution order and reimposed a victim penalty assessment (VPA). Ramos appeals, arguing that restitution, interest on restitution, and the VPA violate the excessive fines clause of the Eighth Amendment to the United States Constitution and article I, § 14 of the Washington Constitution because he is indigent and lacks the ability to pay.

---

[1] We affirmed these convictions on appeal. *See State v. Ramos*, No. 73063-1-I, 193 Wn. App. 1033, 2016 WL 1627704 (2016) (unpublished).

We conclude that article I, § 14 of our state constitution provides no greater protection against excessive fines than the Eighth Amendment. We further conclude that under the Eighth Amendment, restitution is not grossly disproportional when based on actual victim losses. The majority further concludes that the statute imposing interest on restitution is not punitive in nature but is instead intended to compensate victims for the lost value of money. Because interest is not punitive in nature, it is not subject to an excessive fines clause analysis. We therefore affirm.

## FACTS

A jury convicted Ramos in 2015 of assaulting a homeless man, Jarvis Capucion, with a knife, and stealing his backpack, in an unprovoked attack. *Ramos*, 2016 WL 1627704 at *1. The trial court sentenced Ramos to 169 months in prison based on an offender score of 4. His offender score included points for two prior felony convictions, a 2000 conviction for second degree burglary and a 2005 conviction for possession of cocaine. The trial court waived discretionary legal financial obligations (LFOs), imposed the mandatory $500 VPA[2] and the $100 DNA collection fee, ordered that Ramos pay restitution, and waived interest on the LFOs, except with respect to restitution. At a subsequent restitution hearing, the trial court ordered Ramos to pay $50,591.70 in restitution, the identified payees being his victim, Capucion ($591.70), the Crime Victims

---

[2] In Washington, all persons found guilty of a felony are required to pay a $500 victim penalty assessment. RCW 7.68.035(1)(a). The court pays these assessments to the county treasurer who deposits the money it receives into a fund "maintained exclusively for the support of comprehensive programs to encourage and facilitate testimony by the victims of crimes and witnesses to crimes." RCW 7.68.035(4).

No. 82818-5-I/3

Compensation Fund ($35,000), the Health Care Authority ($4,000), and United Healthcare Community Plan ($11,000).[3]

In early 2021, Ramos filed a pro se motion to strike his legal financial obligations.[4] On February 9, 2021, the trial court held that the LFOs "are not subject to recall," that Ramos may become eligible for a waiver of interest on the restitution award when released from custody under RCW 10.82.090,[5] and that both the VPA and DNA fee were mandatory at the time Ramos was sentenced. The court further held that restitution is mandatory, "absent extraordinary circumstances," and found that "Mr. Ramos' sentencing judge considered his lawyer's brief challenging the amount of restitution to be ordered, and in fact did order restitution in an amount less than that requested by the Government." It noted that Ramos did not challenge the restitution in his direct appeal. The court advised that "[i]f Mr. Ramos feels that any LFO was improperly imposed in violation of the law, he may file a petition for Post-Conviction Relief with the Washington State Court of Appeals."

Shortly thereafter, the Supreme Court issued *Blake*, the legal effect of which was to invalidate Ramos's prior drug possession conviction. Ramos filed a pro se motion to reconsider the February 2021 order and the trial court reserved ruling

---

[3] The documentation supporting this order is not in the record.

[4] This motion is also not in the record.

[5] RCW 10.82.090(2) allows a court to reduce interest on restitution only if the principal has been paid in full. The Washington legislature amended this statute, effective January 1, 2023, to allow a court to waive all interest accruing on restitution during the offender's incarceration "if the court finds that the offender does not have the current or likely future ability to pay." Laws of 2022, ch. 260, § 12.

until the *Blake* decision became final.  The State subsequently conceded that under *Blake*, Ramos's drug possession conviction could not be included in his offender score and that he needed to be resentenced.

Ramos and his counsel appeared for resentencing on June 4, 2021.  Ramos did not raise the February 2021 ruling on his mandatory LFOs.  Nor did Ramos object to the imposition of the mandatory $500 VPA.  In fact, his attorney informed the trial court that Ramos did not object to the original restitution order.  He stated "we're not contesting the amount.  And again, I have looked at the materials.  It's all for the injuries and . . . those were appropriate."

Ramos argued instead that the trial court should strike any interest that had accumulated since the original 2015 sentencing.  According to counsel, Ramos owed $34,229 in interest, in addition to the $49,810.15 principal balance, and *Blake* required the court to void the interest and restart it "anew today."  The trial court questioned the assumption that *Blake* affected the validity of the 2015 restitution order.  It indicated that while sympathetic to the argument that significant LFOs make it difficult for people to reenter society after leaving prison, it was not aware of any authority stating that the *Blake* decision impacted a prior restitution order.  The trial court denied the request to strike accrued interest but indicated that it would entertain a motion for reconsideration if Ramos found any authority to support his request.  The trial court then entered an order "affirming prior restitution amount."  The court ordered Ramos to pay the VPA but not the DNA fee as that

No. 82818-5-I/5

fee would have been paid when Ramos was convicted for burglary.[6]  Ramos appeals.

ANALYSIS

Ramos argues that restitution, the accruing interest, and the VPA violate the excessive fines clauses of the Eighth Amendment and article I, § 14 of the Washington state constitution.  We reject these arguments.

A. Preservation of Error for Appeal

The State argues Ramos failed to preserve the issue for appeal by choosing not to challenge the mandatory LFOs on direct appeal or to raise the excessive fines clause argument at resentencing.[7]  Ramos argues he may raise the argument under both RAP 2.5(a) and RAP 2.5(c)(1).  We agree with Ramos.

Generally, this court will decline to consider in a second appeal issues that could have been presented in a prior appeal but were not.  *State v. Barberio*, 121 Wn.2d 48, 51, 846 P.2d 519 (1993).  A trial court, however, has the discretion to revisit issues not addressed by a prior appeal, and the appellate court, in turn, may choose to review any issues the trial court revisited.  RAP 2.5(c)(1) provides:

---

[6] Between the date of Ramos's original sentencing in 2015 and the resentencing in 2021, the Washington legislature amended the statute imposing a mandatory DNA fee to eliminate the requirement when the State had collected a defendant's DNA previously. *State v. Anderson*, 9 Wn. App. 2d 430, 460, 447 P.3d 176 (2019) (noting that the DNA database fee is no longer mandatory if the offender's DNA has been collected because of a prior conviction).

[7] The State argued at oral argument that the challenge constitutes a time-barred collateral attack on his judgment and sentence. July 15, 2022 Court of Appeals, Division I, Argument at 9:09-9:19, available at https://tvw.org/video/division-1-court-of-appeals-2022071050/?eventID=2022071050.  As the State raised this legal argument for the first time at oral argument, we decline to address it.  *See* RAP 12.1(a) (appellate court will decide a case only on the basis of issues set forth by the parties in their briefs); *State v. Johnson*, 119 Wn.2d 167, 170, 829 P.2d 1082 (1992) (argument raised for first time at oral argument is not properly before court and need not be considered).

> If a trial court decision is otherwise properly before the appellate court, the appellate court may at the instance of a party review and determine the propriety of a decision of the trial court even though a similar decision was not disputed in an earlier review of the same case.

In this case, the trial court conducted a complete resentencing hearing in 2021. It considered the State's request for a high-end sentence, despite the fact that the same request had been rejected by the court in 2015. Ramos similarly asked the trial court to consider imposing a low-end sentence, despite the fact that the same argument was rejected by the trial court in 2015. Any legal ruling the trial court made at the 2021 resentencing hearing is appropriately before this court on direct appeal.

Moreover, Ramos did file a pro se motion before the resentencing hearing, asking the court to revisit the LFOs. The court denied that motion. Ramos then asked the court to consider striking accrued interest. The court also rejected that request. These decisions are properly before us.

The State argues Ramos conceded that the restitution amount was reasonable at the resentencing hearing and cannot challenge the amount now. But while a concession as to facts or an exercise of discretion cannot be raised for the first time on appeal, a legal error in a sentence, including restitution, can. *State v. Cosgaya-Alvarez*, 172 Wn. App. 785, 790, 291 P.3d 939 (2013).

Finally, RAP 2.5(a) allows a defendant to raise on appeal any "manifest error affecting a constitutional right." To meet RAP 2.5(a), an appellant must demonstrate (1) the error is manifest and (2) the error is truly of constitutional magnitude. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). In this case,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Ramos contends the restitution, interest, and the VPA violate the excessive fines clause under the federal and state constitution. This claim certainly implicates a constitutional interest.

We further conclude that if we were to accept Ramos's constitutional argument, the alleged error would be manifest. A "manifest" error is one that causes "actual prejudice." *O'Hara*, 167 Wn.2d at 99. The defendant must show that the error had "practical and identifiable consequences" in the case. *Id.* If facts necessary to adjudicate the claimed error are not in the record on appeal, then the defendant fails to demonstrate actual prejudice, and the error is not manifest. *Id.*

In this case, Ramos contends that he will never have the ability to pay off his LFO debt. The State does not contest that Ramos has no assets, income, or financial resources. At his resentencing hearing, counsel informed the court that Ramos was homeless at the time of his 2015 crime. Ramos has been incarcerated since 2015, and it is reasonable to assume, based on this record, that Ramos has no current ability to pay restitution and accrued interest and, when released in five years, will have a limited ability to do so. Based on this record, we will consider his indigency-based constitutional claims under RAP 2.5(a).

B. Excessive Fines

The Eighth Amendment to the United States Constitution and article I, § 14 of the Washington constitution both prohibit excessive fines. Ramos argues mandatory LFOs violate both constitutional provisions when an offender lacks the ability to pay them. He also contends that even if the Eighth Amendment does not provide him with this protection, article I, § 14 gives him broader protection than

the Eighth Amendment and prohibits the imposition of any mandatory LFO on any indigent defendant who lacks the ability to pay.

The Eighth Amendment's excessive fines clause " 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.' " *City of Seattle v. Long*, 198 Wn.2d 136, 159, 493 P.3d 94 (2021) (quoting *Austin v. United States*, 509 U.S. 602, 609-10, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993)) (internal quotation marks omitted). To trigger the excessive fines clause, the monetary sanction must be a "fine," and it must be "excessive." *Id.* at 162. The first question under the Eighth Amendment is whether the monetary sanction is "punishment." *Id.* The second question is whether the sanction is grossly disproportional to the offense. *United States v. Bajakajian*, 524 U.S. 321, 328-29, 334, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998).

In *Bajakajian*, the United States Supreme Court adopted the standard of gross disproportionality articulated under its Cruel and Unusual Punishments Clause precedents. *Id.* at 336. "In applying this standard, the [trial] courts in the first instance, and the courts of appeals, reviewing the proportionality determination de novo, must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." *Id.* at 336-37.

In Washington, the factors we consider are (1) the nature and extent of the crime; (2) whether the violation was related to other illegal activities; (3) the other penalties that may be imposed for the violation; (4) the extent of the harm caused;

and (5) "a person's ability to pay the fine."[8]  *Long*, 198 Wn.2d at 173; *State v. Grocery Mfrs. Ass'n*, 198 Wn.2d 888, 899, 502 P.3d 806 (2022).  Review is de novo.  *Id.*

### 1.  Independent State Constitutional Interpretation

Ramos first urges us to hold that, under article I, § 14 of our state constitution, a defendant's inability to pay renders any mandatory LFO, including restitution, grossly disproportional, regardless of the crime or the harm the defendant caused.  This argument requires us to determine whether the state constitution's excessive fines clause is different from, and more protective than, the Eighth Amendment.

Although our Supreme Court has held that the state's cruel punishment clause is more protective than the Eighth Amendment, *State v. Roberts*, 142 Wn.2d 471, 506, 14 P.3d 713 (2000), it has yet to extend that holding to the excessive fines clause.  *Long*, 198 Wn.2d at 159.  While the petitioner raised this argument in *Long*, the Supreme Court refused to consider it because Long failed to provide an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).  *Long*, 198 Wn.2d at 159.  The court in *Long* stated that "[a]bsent support for an

---

[8] The State asks this court to conclude that the inability to pay is not a recognized factor under *Bajakajian* and should not apply when considering the proportionality of a restitution order.  We recognize that some federal courts have so held.  *See United States v. Dubose*, 146 F.3d 1141, 1146 (9th Cir. 1998) ("[A]n Eighth Amendment gross disproportionality analysis does not require an inquiry into the hardship the sanction may work on the offender."); *United States v. Viloski*, 814 F.3d 104, 111 (2d Cir. 2016) (while court may consider whether a forfeiture "deprive[s] a defendant of his livelihood," it may not consider whether the offender's current financial condition renders him unable to pay); and *United States v. Seher*, 562 F.3d 1344, 1371 (11th Cir. 2009) ("We do not take into account the impact the fine would have on an individual defendant.").  We, however, follow the test articulated by our Supreme Court in *Long*.

No. 82818-5-I/10

independent analysis, we view article I, section 14 and the Eighth Amendment as coextensive for the purposes of excessive fines." *Id. See also Jacobo Hernandez v. City of Kent*, 19 Wn. App. 2d 709, 719, 497 P.3d 871 (2021), *review denied sub nom. Hernandez v. City of Kent*, 199 Wn.2d 1003, 504 P.3d 828 (2022) (viewing two constitutional provisions as coextensive in absence of *Gunwall* analysis).

Ramos has provided the *Gunwall* analysis missing in *Long* and *Jacobo Hernandez.* We thus consider his independent state constitutional argument. The six *Gunwall* factors to consider are "(1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern." 106 Wn.2d at 58.

A recent decision of this court held that there is no basis under *Gunwall* to interpret article I, § 14 as extending its protections further than the Eighth Amendment. *State v. Tatum*, No. 82900-9-I, slip op. at 11 (August 8, 2022). We agree with the reasoning of *Tatum* and reach the same conclusion here.

The first two *Gunwall* factors focus our attention on the text of the two constitutions. "The text of the state constitution may provide cogent grounds for a decision different from that which would be arrived at under the Federal Constitution. It may be more explicit or it may have no precise federal counterpart at all." *Gunwall*, 106 Wn.2d at 61. Furthermore, "[e]ven where parallel provisions of the two constitutions do not have meaningful differences, other relevant provisions of the state constitution may require that the state constitution be interpreted differently." *Id.*

- 10 -

Article I, § 14, entitled "Excessive Bail, Fines and Punishments," provides "Excessive bail shall not be required, excessive fines imposed, nor cruel punishment inflicted."  The Eighth Amendment provides ""Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  The text of the state and federal excessive fines clauses is identical.  The state constitution is no more explicit than the federal.  And Ramos has not identified any other relevant provisions of the state constitution that suggest the excessive fines clause should be interpreted any differently than the federal.  The first two *Gunwall* factors weigh against an independent interpretation of article I, § 14.

Under the third *Gunwall* factor, we look to identify any constitutional history that would warrant a departure from Eighth Amendment jurisprudence.  *Gunwall* provides that our constitutional history "may reflect an intention to confer greater protection from the state government than the Federal Constitution affords from the federal government.  The history of the adoption of a particular state constitutional provision may reveal an intention that will support reading the provision independently of federal law."  106 Wn.2d at 61.

Ramos concedes there is little historical support for an independent reading of article I, § 14's excessive fines clause.  Records of how any of the Washington constitutional provisions were enacted are limited.  *State v. Silva*, 107 Wn. App. 605, 619, 27 P.3d 663 (2001).  We know that Washington's constitutional framers copied much of the state Declaration of Rights from constitutions of older states, and not from the federal constitution.  Robert F. Utter, *Freedom and Diversity in a*

- 11 -

No. 82818-5-I/12

*Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. PUGET SOUND L. REV. 491, 497 (1984); Arthur S. Beardsley, *Sources of Washington Constitution*, in CONSTITUTIONS OF THE UNITED STATES AND THE STATE OF WASHINGTON, at 166, 170 (1955).

But the Eighth Amendment's excessive fines clause had its origins in these same state constitutions. In *Long*, our Supreme Court explained that the excessive fines clause was taken "verbatim" from the English Bill of Rights and the Magna Carta. 198 Wn.2d at 159-60. The state of Virginia was the first state to adopt the familiar language from the English Bill of Rights and the Eighth Amendment "was based directly on article I, section 9 of the Virginia Declaration of Rights of 1776." *Id.* All 50 states now have a constitutional provision against excessive fines. *Id.* (citing *Timbs v. Indiana*, __ U.S. __, 139 S. Ct. 682, 689, 203 L. Ed. 2d 11 (2019)).

The excessive fines clause in article I, § 14, like the Eighth Amendment, is identical in text to article I, § 9 of the Virginia Constitution.[9] Because our provision has the same origin as the Eighth Amendment, this history supports a reading of the Washington constitutional provision that is coextensive with the federal provision.

Next, we consider preexisting state law. Under *Gunwall*'s fourth factor, preexisting state law, including statutory law, "may also bear on the granting of distinctive state constitutional rights" because state law may have been more responsive to its citizens' concerns before they were addressed by the constitution. 106 Wn.2d at 61. As a result, "[p]reexisting law can thus help to define the scope

---

[9] https://law.lis.virginia.gov/constitution/article1/section9/

of a constitutional right later established." *Id.* at 62. Specifically, "[t]he fourth *Gunwall* factor directs us to consider whether established bodies of state law, including statutory law, support more protective state constitutional rights." *Matter of Williams*, 198 Wn.2d 342, 358, 496 P.3d 289 (2021). This means that "courts consider not just the particular constitutional provision but all statutory and case law related to the issue." *Id*. (citations omitted). The question is then whether Washington law has been more protective than federal law in the same context.[10] *Id*.

The State contends that we must look only to laws in place when Washington was a territory. This approach does not appear entirely consistent with precedent. In *Ino Ino, Inc. v. City of Bellevue,* 132 Wn.2d 103, 120, 937 P.2d 154 (1997), the Supreme Court noted that "[s]tate cases and statutes from the time of the constitution's ratification, rather than recent case law, are more persuasive in determining whether the state constitution gives enhanced protection in a particular area." But the court has also looked at the evolution of state law since ratification. *See State v. Schaaf*, 109 Wn.2d 1, 14-15, 743 P.2d 240 (1987) (territorial legislators did not anticipate enactment of juvenile justice system at time of statehood, and "[i]t does no violence to our state's common law history to give credence to a 70-year-old legal system that was nonexistent in our territorial days."). "Historical analysis is relevant though not necessarily dispositive in a question of state constitutional interpretation. The court should be free to consider

---

[10] We note that like the fifth *Gunwall* factor, this factor "depends in large part on how the issue is framed." *State v. Nelson*, 7 Wn. App. 2d 588, 604, 434 P.3d 1055 (2019) (discussing sixth factor). If framed too narrowly, a court is less likely to find preexisting law on a particular issue.

current values and conditions as one factor in interpreting the state constitution."

*State v. Reece*, 110 Wn.2d 766, 779, 757 P.2d 947 (1988) (citing Utter, 7 U. PUGET

SOUND L. REV. at 524).

Using this approach, other than the excessive fines clause in article I, § 14

itself, we have found no preexisting Washington statutory or common law that

evinces concerns about imposing financial obligations on indigent defendants, or,

more specifically, laws regarding restitution or debts owed to victims for damages

inflicted through their crimes.

The legislature has more recently addressed the issue of an indigent

defendant's ability or inability to pay restitution. In 1995, the legislature amended

restitution provisions of the SRA to provide that "[t]he court may <u>not</u> reduce the

total amount of restitution ordered because the offender may lack the ability to pay

the total amount." Laws of 1995, ch. 231, § 1(1) (emphasis added). The

legislature, however, stated that if a court sets a monthly amount that an offender

is required to pay towards restitution, the court "should" take into consideration "the

offender's present, past, and future ability to pay" a particular monthly amount. But

it also stated that the court "shall not issue any order that postpones the

commencement of restitution payments until after the offender is released from

total confinement." RCW 9.94A.753(1).

And while the SRA gives a sentencing court the discretion to not impose

restitution in cases involving personal injuries if "extraordinary circumstances exist

that would make restitution inappropriate," RCW 9.94A.753(5), that discretion does

not extend to cases where "the victim is entitled to benefits under the crime victims'

compensation act, chapter 7.68 RCW." RCW 9.94A.753(7). In such a case, the defendant may instead seek a modification of a restitution order through a petition to the Department of Labor and Industries, the agency in charge of the crime victims' compensation fund. RCW 7.68.120(5). This statutory restitution scheme does not evidence any legislative intent to provide indigent defendants with more statutory protections than are protected under the federal constitution's excessive fine clause.[11]

Under the fifth *Gunwall* factor, we recognize that the federal constitution is a grant of enumerated powers to the federal government and serves as a limit on its power, while the state constitution is viewed as a guarantee of rights. 106 Wn.2d at 62. As a result, the fifth factor always favors an independent analysis. *State v. Smith*, 150 Wn.2d 135, 152, 75 P.3d 934 (2003). While the structure of our state constitution favors Ramos's argument, it too is not determinative.

Finally, the sixth factor, whether the issue presented is an issue of particular state or local concern, is not especially helpful here. "How one views this factor depends in large part on how the issue is framed." *State v. Nelson*, 7 Wn. App. 2d 588, 604, 434 P.3d 1055 (2019). If the question is defined "at a high level of generality," then the factor will always favor an independent interpretation. *Id.*

---

[11] In contrast to restitution statutes, the legislature has stated that courts may not assess "costs" if a defendant is indigent at the time of sentencing. RCW 10.01.160(3). "Costs," however, are legislatively defined as "expenses specially incurred by the state in prosecuting the defendant or in administering a deferred prosecution program . . . or pretrial supervision." RCW 10.01.160(1). In *State v. Blazina*, 182 Wn.2d 827, 836, 344 P.3d 680 (2015) and *State v. Ramirez*, 191 Wn.2d 732, 744, 426 P.3d 714 (2018), the Supreme Court affirmed the statutory requirement that courts must conduct an individualized inquiry into a defendant's ability to pay these costs before imposing them. But the framework for assessing the ability to pay these discretionary costs is different from the statutory process for ordering restitution.

- 15 -

No. 82818-5-I/16

Ramos employs this high level of generality by arguing that "[c]riminal law is a matter of local concern generally delegated to the states." (Citing *Bond v. United States*, 572 U.S. 844, 848, 134 S. Ct. 2077, 189 L. Ed. 2d 1 (2014)). But in *State v. Manussier*, 129 Wn.2d 652, 921 P.2d 473 (1996), the Washington Supreme Court, when evaluating whether the state's three strikes law violated state due process protections of article I, § 3, noted that the sixth factor did not favor an independent state constitutional interpretation because the three strikes initiative "is no more a matter of *particular* state concern than any other law challenged on due process grounds." *Id.* at 680. *Manussier* suggests that an independent interpretation of a state constitutional right is not always appropriate simply because the statute at issue is a criminal one.

Ramos also maintains that Washington has a particular interest in how legal debt impacts its residents.[12] We agree that Washington has an interest in understanding the effect LFOs have on an individual's ability to integrate back into their community after being convicted of a crime. But our state has no greater interest in protecting its citizens from excessive fines than does any other state or the federal government.

In *Timbs*, the United States Supreme Court recently held that the Eighth Amendment's excessive fines clause is a protection applicable to the states by virtue of the Fourteenth Amendment's due process clause. 139 S. Ct. at 687. It

---

[12] Ramos cites to Cynthia Delostrinos, Michelle Bellmer & Joel McAllister, State Minority & Justice Comm'n, *The Price of Justice: Legal Financial Obligations in Washington State* (2022); Katherine Beckett & Alexes Harris, State Minority & Justice Comm'n, *The Assessment and Consequences of Legal Financial Obligations in Washington State* (2008).

reached this holding by recognizing that the prohibition on excessive fines is a "fundamental" protection that "has been a constant shield throughout Anglo-American history," adopted without question by almost every state in the country and by the nation as a whole with the ratification in 1868 of the Fourteenth Amendment. Indeed, the court noted that "[e]xorbitant tolls undermine other constitutional liberties," such that protecting individuals from "excessive punitive economic sanctions" is "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 689 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010)).

The prohibition on excessive fines is a matter of state and local concern—as is every single right set out in our state declaration of rights. But the fundamental nature of the prohibition on excessive fines is clearly a matter of national concern as well. For this reason, the sixth *Gunwall* factor does not support an independent interpretation of article I, § 14's excessive fines clause.

On balance, we find no basis for interpreting article I, § 14 any differently than the Eighth Amendment. The text is identical. Their origins are the same. Preexisting state law does not weigh in favor of an independent interpretation. And the fundamental right to be free from excessive fines, as set out in the Eighth Amendment, is just as important to citizens of the United States as it is to citizens of Washington state. We therefore interpret the federal and state excessive fines clauses coextensively.

2.  Are mandatory LFOs "punishment"?

Ramos challenges mandatory restitution, accrued interest, and the VPA as a part of his criminal sentence subject to the Eighth Amendment gross disproportionality test. The State contends that none of these mandatory LFOs are punishment for purposes of the Eighth Amendment excessive fines clause. We agree that restitution is punishment for purposes of the excessive fines clause analysis but neither interest nor the VPA meet this element of the test.

Under the Eighth Amendment, a sanction is punishment if it is "partially punitive." *Long*, 198 Wn.2d at 163. If the statute imposing the sanction "has any purpose not solely remedial," it is punishment under the Eighth Amendment. *Id.* (quoting *Tellevik v. 6717 100th Street S.W.*, 83 Wn. App. 366, 372, 921 P.2d 1088 (1996)).

a.  Restitution

The United States Supreme Court has never explicitly held that the excessive fines clause of the Eighth Amendment applies to restitution awards. *United States v. Gozes-Wagner*, 977 F.3d 323, 347 (5th Cir. 2020). But, in dicta, it stated that restitution awards implicate the prosecutorial powers of government and serve both a compensatory and punitive purpose which "may be sufficient to bring it within the purview of the Excessive Fines Clause." *Paroline v. United States*, 572 U.S. 434, 456, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014) (mandatory restitution to victims of child pornography or sexual exploitation under 18 U.S.C. § 2259, if not limited to losses proximately caused by defendant's offense conduct, would raise concerns under the excessive fines clause).

- 18 -

Our Supreme Court recognized that restitution under the SRA is partially punitive. In *State v. Kinneman*, 155 Wn.2d 272, 279, 119 P.3d 350 (2005),[13] the court described restitution as both punitive and compensatory. *Id.* The court noted that, while one part of the restitution statute required the amount awarded to be tied to the victim's loss, another part in the same statutory provision authorized the trial court to award an amount up to "double the amount of the offender's gain or the victim's loss from the commission of the crime." *Id.* at 280. It concluded that this aspect of the statute made restitution at least as punitive as compensatory.[14] *Id.* at 281.

---

[13] The question arose in the context of deciding whether a defendant had the right to a jury determination of restitution under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

[14] Some state courts have rejected this reasoning. *See State v. Johnson*, 430 P.3d 494, 500 (2018) (restitution is not punitive because it compensates victims for losses directly attributable to offender's criminal behavior); *State v. Robison*, 469 P.3d 83, 90 (2020) (restitution is restorative in nature and not punitive; imposition of restitution does not violate Sixth Amendment right to trial by jury); *State v. DeAngelis*, 329 N.J. Super. 178, 190, 747 A.2d 289 (2000) ("[R]estitution is not meant to punish, but rather to rehabilitate the criminal."); *State v. Rey*, 905 N.W.2d 490, 496-97 (Minn. 2018) (mandatory minimum amount of restitution is not a fine). But some state courts have used the same approach as our Supreme Court. *See State v. McCulley*, 939 N.W. 2d 373, 380 (2020) (restitution "is a criminal penalty imposed as a punishment for a crime and is part of the criminal sentence imposed by the sentencing court."); *People v. Stafford*, 93 P.3d 572, 574 (Colo. App. 2004) ("restitution can be considered punitive in nature") (internal citations omitted); *State v. Ramos*, 340 P.3d 703, 708 (Or. App. 2014), *aff'd*, 368 P.3d 446 (Or. 2016) (restitution is form of punishment). California courts have drawn a distinction between restitution paid as a fine to the state and restitution paid to a victim as compensation for a loss. *See People v. Cowan*, 47 Cal. App. 5th 32, 42, 260 Cal. Rptr. 3d 505 (2020) (restitution fine is punitive in nature and subject to analysis under Eighth Amendment and article I, section 17 of California state constitution); *People v. Aviles*, 39 Cal. App. 5th 1055, 1071 n.27, 252 Cal. Rptr. 3d 727 (2019) (victim restitution, unlike restitution fines, is not defined as punishment since it is paid to the victim as compensation for loss and not to a sovereign as punishment for an offense).

The State cites to *United States v. Newman*, 144 F.3d 531, 538 (7th Cir. 1998), for the proposition that restitution is an equitable payment inuring only to the benefit of a specific victim and thus does not possess a punitive character. This Seventh Circuit decision, however, appears to be a minority approach. In *United States v. Schulte*, 264 F.3d 656, 661-62 (6th Cir. 2001), the court noted that the majority of federal circuit courts have held that mandatory restitution is punishment, at least in the context of the ex post facto clause.[15] Furthermore, as our court made clear in *Tatum*, the ex post facto analysis is different from an excessive fines analysis and would not be determinative of whether a statute is punitive under the excessive fines clause. *Tatum*, slip op. at 7 n.2.

The State also argues that the court should not look at the overall purpose of the restitution statute in determining if restitution is punishment, but should instead look to whether, in this particular case, Ramos's particular order fits that description. Because the restitution amount is linked to Capucion's medical expenses resulting from the attack, the State contends it is not punishment. But the test in Washington is not whether a *particular* restitution order is compensatory

---

[15] Many federal courts addressing restitution under the Excessive Fines Clause have either held that restitution is partially punitive or assumed it to be. *See Dubose*, 146 F.3d at 1144 (restitution under federal Mandatory Victims Restitution Act, 18 U.S.C. § 3363A-3664, is punishment under Excessive Fines Clause); *United States v. Hardy*, 707 F. Supp. 2d 597, 603-04 (W.D. Penn. 2010) (surveying circuit court decisions holding that mandatory restitution under 18 U.S.C. § 2259 is a criminal penalty not to be confused with civil damages, the purpose of which is partially punitive, retributive, and rehabilitative); *United States v. Lessner*, 498 F.3d 185, 205 (3d Cir. 2007) (assumed mandatory restitution implicated Eighth Amendment); *United States v. Newsome*, 322 F.3d 328, 342 (4th Cir. 2003) (restitution is subject to excessiveness analysis under Eighth Amendment); *United States v. Bollin*, 264 F.3d 391, 418 n.18 (4th Cir. 2001) *overruled on other grounds by United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017) (forfeiture of funds bilked from investors in fraud scheme under 18 U.S.C. § 982(a)(1) is part of criminal sentence and punitive under excessive fines clause).

- 20 -

or punitive. In *Harris v. Charles,* 151 Wn. App. 929, 940, 214 P.3d 962 (2009), this court stated that "[t]o determine whether an action is punishment, we look to legislative intent." *Kinneman* determined that the legislature intended restitution to be partially punitive. Because our restitution statute is partially punitive in nature, a restitution order is subject to challenge under the excessive fines clause of the Eighth Amendment and article I, § 14.

b. Interest on Restitution

Ramos next argues that imposing interest on a restitution award is also punitive. According to his calculations, Ramos currently owes at least $34,228.89 in interest in addition to $49,810.15 in principal. He maintains that the "exorbitant rate" of 12 percent under RCW 10.82.090(1), accruing while he is incarcerated, destines him to a life of poverty. He contends it has no "connection to the offense," and is accruing only because he is poor. We conclude, however, that there is nothing to indicate that the legislature intended interest on restitution to be punitive.

Ramos has identified no case in which a court concluded that interest on a restitution award is punitive in nature. The reasoning from *Long* strongly suggests that it is not. In that case, the Supreme Court held that fees imposed on a driver to reimburse the city the cost of towing and storing the vehicle were punitive and subject to the excessive fines clause because the city code characterized them as a "penalty" and the costs compensated the government for lost revenue. 198 Wn.2d at 164.

Neither is true here. Although the SRA does not address the purpose of imposing interest on restitution awards, the legislature has found "a compelling

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

state interest in compensating the victims of crime and in preventing criminals from profiting from their crimes." RCW 7.68.300. The legislature has expressly indicated an intent to treat restitution orders in the same manner as any other civil judgment. The interest provision, RCW 10.82.090(1), provides that restitution will bear interest from the date of judgment until paid, at the same rate as civil judgments. RCW 9.94A.750(8) explicitly provides that a victim "may enforce the court-ordered restitution in the same manner as a judgment in a civil action."

In the civil context, the purpose of requiring any judgment debtor to pay interest on a judgment is to compensate the judgment creditor for the lost value of money. *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 552, 114 P.3d 1182 (2005). Interest on civil judgments is not imposed as a punishment. *Id. See also Hansen v. Rothaus*, 107 Wn.2d 468, 474-75, 730 P.2d 662 (1986) (prejudgment interest "is not a penalty imposed on a defendant for wrongdoing nor is its purpose to deter wrongdoing.") In light of the legislature's stated intention to treat criminal restitution orders like civil judgments, it follows that it intended to impose interest on that judgment to compensate the victim for the lost value of money, not as a penalty for wrongdoing.

Moreover, interest on restitution is not shared with any government entity. Only nonrestitution interest is paid to the government. RCW 10.82.090(1) ("[a]ll nonrestitution interest retained by the court shall be split twenty-five percent to the state treasurer for deposit into the state general fund, twenty-five percent to the state treasurer for deposit into the judicial information system account as provided in RCW 2.68.020, twenty-five percent to the county current expense fund, and

No. 82818-5-I/23

twenty-five percent to the county current expense fund to fund local courts."). Interest on restitution goes to the victims identified in the judgment and sentence. RCW 9.94A.750(8). The legislature clearly intends that victims be made whole.

Because the legislature did not intend for interest to be a penalty, and because interest accruing on restitution is paid to crime victims rather than to the government, interest on restitution awards is not punishment and not subject to an excessive fines clause analysis under the Eighth Amendment or article I, § 14.

c. Victim Penalty Assessment

Ramos separately asks the court to hold that the $500 VPA is a part of his punishment and is subject to the Eighth Amendment. We reject this argument as inconsistent with the Supreme Court's decision in *State v. Curry*, 118 Wn.2d 911, 917-18 n.3, 829 P.2d 166 (1992) (the victim penalty assessment is neither unconstitutional on its face nor as applied to indigent defendants). As this court explained in *Tatum*, we are bound by this holding here. *Tatum*, slip op. at 6-7.

3. Is restitution based on actual victim losses grossly disproportional to the crime that caused those losses?

Ramos asks this court to hold that restitution, even when based on actual victim losses, is grossly disproportional to any crime if the defendant lacks the ability to pay it. We cannot agree with this sweeping proposition.

First, Ramos cites no relevant authority for this proposition. Neither the Supreme Court's decision in *Long*, nor this court's decision in *Jacobo Hernandez,* addressed restitution to a crime victim based on that victim's actual losses. In *Long*, the city chose to seize an illegally parked truck and then demanded that its owner pay the costs the city incurred in towing and impounding the vehicle to avoid

- 23 -

the city selling the truck at a public auction. 198 Wn.2d at 143. The Supreme Court acknowledged that the towing and impoundment fees were intended to reimburse the city for the costs it incurred in enforcing its parking laws. 198 Wn.2d at 174. But the city was not the victim of any crime. Long's offense was a civil parking infraction carrying a fine of $44. *Id.* at 173. *Long* is thus distinguishable from this case.

So too is *Jacobo Hernandez*. In that case, the city sought a civil forfeiture of a car that its owner used to deliver drugs after the defendant was prosecuted in federal court for his crimes. 19 Wn. App. 2d at 711. Under Washington's civil forfeiture system, local law enforcement agencies retain 90 percent of the net proceeds from drug assets seized with the remaining ten percent going into the state's general fund. *Id.* at 714, 725. The city, again, was not the victim of Jacobo Hernandez's crimes, and the proceeds it sought to retain through civil forfeiture had no causal link to those crimes.

Second, the legislature has determined that crime victims have a right to "entry of an order of restitution by the court in all felony cases, even when the offender is sentenced to confinement," except in "extraordinary circumstances." RCW 7.69.030(15). The legislature has indicated that the inability to pay is *not* an extraordinary circumstance. Under RCW 9.94A.753(4) and RCW 9.94A.750(4), "[t]he court may not reduce the total amount of restitution ordered because the offender may lack the ability to pay the total amount." RCW 9.94A.750(1) provides that a defendant's ability to pay is a consideration only when the court is setting a minimum monthly payment. Were we to rule that the constitutionality of a

restitution award depends, not on the gravity of the crime or the extent of the victim's injuries, but solely on whether that offender is rich or poor, we would in effect be invalidating these statutes.[16]

Third, several courts have held that when restitution is based on the victim's actual losses, it is inherently proportional to the crime, even if the defendant lacks the ability to pay. In *Dubose,* the Ninth Circuit held that "proportionality is inherent in a MVRA restitution order. 'Where the amount of restitution is geared directly to the amount of the victim's loss caused by the defendant's illegal activity, proportionality is already built into the order.' " 146 F.3d at 1145 (quoting *United States v. Dean*, 949 F. Supp. 782, 786 (D. Or. 1996)). The court in *Dubose* further noted that a defendant's financial condition does not change this outcome: "in the restitution context, because the full amount of restitution is inherently linked to the culpability of the offender, restitution orders that require full compensation in the amount of the loss are not excessive." *Id.* at 1146.

We agree with the reasoning of *Dubose* and hold that a restitution award based on a victim's actual losses is inherently proportional to the crime that caused the losses because the amount is linked to the culpability of the defendant and the extent of harm the defendant caused. A defendant's inability to compensate the victim for the losses he caused will not render the restitution amount grossly disproportional.

---

[16] There certainly are policy reasons why a legislature might choose to address a defendant's inability to pay restitution through legislation. It has in fact already done so. Effective January 1, 2023, any defendant may petition a court to be relieved of the requirement to pay full or partial restitution and accrued interest on restitution where the entity to whom restitution is owed is an insurer or state agency. Laws of 2022, ch. 260, §§ 3, 12.

- 25 -

This principle is demonstrated by the facts of this case. Ramos was convicted of first-degree assault and first-degree robbery while armed with a deadly weapon, class A felonies. RCW 9A.36.011(2); RCW 9A.56.200(2). Both fall within the statutory definition of "most serious offense." RCW 9.94A.030(32)(a). Assault in the first degree is also defined as a "serious violent offense" under RCW 9.94A.030(46)(v). The statutory maximum sentence for both of Ramos's felonies was life in prison and/or a fine of $50,000. RCW 9A.20.021(1)(a) (maximum sentence for class A felony). Capucion's injuries from the attack were extensive. He was on life support for almost three weeks, sustained punctured lungs, and could not breathe on his own. His doctors had to remove his spleen. Given the severity of Ramos's crimes and the significance of the harms he caused, requiring Ramos to pay the costs of the physical injuries he inflicted is not grossly disproportional to his crimes and does not violate the Eighth Amendment or article I, § 14.

C. Accrual Date for Interest

Ramos next argues that if the restitution order is constitutional, this court should alternatively hold that no interest accrued on that debt until the trial court entered the revised judgment and sentence in 2021. He contends that under *State v. Barbee*, 193 Wn.2d 581, 444 P.3d 10 (2019), the "trigger" date for restitution was the date of his resentencing and that any restitution order entered prior to that date is void. Ramos misreads *Barbee.*

In that case, after the Supreme Court partially vacated Barbee's criminal sentence on appeal and remanded his case for resentencing, the trial court

No. 82818-5-I/27

granted the State's motion to increase the restitution award. *Id.* at 585. Barbee challenged the court's statutory authority to modify the restitution order on remand, arguing that the 180-day deadline for holding a restitution hearing set out in RCW 9.94A.753(1) had long passed. 193 Wn.2d at 587-88. The Supreme Court rejected Barbee's argument as inconsistent with the statutory language and contrary to the purpose of the restitution statute and its mandatory timeline. *Id.* It concluded that the new sentencing hearing triggered the court's authority to order additional restitution because Barbee was resentenced at that hearing. *Id.* at 587.

Ramos argues that *Barbee* makes his prior restitution order void. We disagree. *Barbee* did not hold that the original restitution order was void, and "there is a vast difference between a judgment which is void and one which is merely erroneous." *Dike v. Dike*, 75 Wn.2d 1, 8, 448 P.2d 490 (1968).

> [A] judgment rendered by a court of competent jurisdiction is not void merely because there are irregularities or errors of law in connection therewith. This is true even if there is a fundamental error of law appearing upon the face of the record. Such a judgment is, under proper circumstances, voidable, but until [voided] is regarded as valid.

*Id.* Here, the restitution order was valid between 2015 and 2021.

Moreover, RCW 4.56.110(6) provides that,

> [i]n any case where a court is directed on review to enter judgment on a verdict or in any case where a judgment entered on a verdict is wholly or partly affirmed on review, interest on the judgment or on that portion of the judgment affirmed shall date back to and shall accrue from the date the verdict was rendered.

Because Ramos's conviction and sentence were affirmed by this court on direct review, postjudgment interest on restitution dates back to the date of the original restitution order.

- 27 -

Ramos argues RCW 4.56.110(6) applies only to prejudgment interest in civil litigation and the only relevant statute here is RCW 10.82.090. App. Reply at 23-24. We reject this argument. First, RCW 4.56.110 is the statute governing postjudgment interest. *TJ Landco, LLC v. Harley C. Douglass, Inc.*, 186 Wn. App. 249, 256, 346 P.3d 777 (2015) ("[p]ostjudgment interest is mandatory due to RCW 4.56.110."). Prejudgment interest is governed by RCW 19.52.010. *Id.* at 255.

Second, RCW 10.82.090 and RCW 4.56.110(6) cross-reference each other. RCW 10.82.090(1) provides that interest on restitution shall be at "the rate applicable to civil judgments." RCW 4.56.110(6) provides that applicable rate. And the latter statute explicitly refers back to the criminal restitution statute, providing that "[t]he method for determining an interest rate prescribed by this subsection is also the method for determining the 'rate applicable to civil judgments' for purposes of RCW 10.82.090." We reject Ramos's argument that interest cannot accrue from the date of his original 2015 restitution order.

D. Statement of Additional Grounds

Finally, Ramos alleges ineffective assistance of counsel in a statement of additional grounds. He contends the attorney who represented him at the June 4, 2021 resentencing hearing was unprepared, did not conduct a reasonable investigation before the hearing, misinformed Ramos that "the interest for the restitution [would] be dropped or restart[ed] at zero," did not prepare Ramos for that hearing, and should have asked for a continuance. Ramos also alleges that the attorney altered the language on the judgment and sentencing form without any signatures or initials beside the alterations; Ramos claims he was not informed

about and did not understand these changes.  Because these allegations rest on matters outside the record, we cannot address them on direct appeal.  *See State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995) (if a defendant wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition).[17]

We affirm.

Andrus, C.J.

CONCUR:

Birk, J

---

[17] We deny Appellant's motion to strike Respondent's July 14, 2022 Statement of Additional Authorities.

CHUNG, J., concurring in part and dissenting in part.

At Ramos's resentencing, the trial court entered an order requiring restitution in the same amount as the original restitution and to the same payees: a total of $50,591.70 apportioned as $591.70 to the victim; $35,000 to the Crime Victims Compensation Fund; $4,000 to the Health Care Authority; and $11,000 to the United Healthcare Community Plan. Four months prior to his resentencing, Ramos owed $34,228.89 in interest in addition to the principal restitution debt of $49,810.15. In this appeal, Ramos challenges the imposition of restitution, 12 percent interest on restitution, and the Victim Penalty Assessment (VPA) as violations of the excessive fines clause.

I concur with the majority that article I, § 14 of our state constitution provides no greater protection against excessive fines than the Eighth Amendment. I also concur with the majority's analysis of the VPA and restitution under the Eighth Amendment. However, with regard to interest on restitution, I would hold that like restitution itself, interest on restitution is also punitive in part, and thus subject to the Eighth Amendment. I would further hold that the interest on restitution that was imposed as part of Ramos's sentence is grossly disproportional to the crimes for which he was convicted, and thus, that the interest portion of the sentence violates the Eighth Amendment.

No. 82818-5-I/2

A. Whether interest on restitution is punitive

To determine whether the excessive fines clause of the Eighth Amendment[1] applies to interest on restitution, we first must address whether the interest imposed on restitution is punitive. See City of Seattle v. Long, 198 Wn.2d 136, 163, 493 P.3d 94 (2021) ("[T]he first step in an excessive fines inquiry is whether the state action is 'punishment.' "). To determine whether state action is "punishment," we look to legislative intent. Harris v. Charles, 151 Wn. App. 929, 940, 214 P.3d 962 (2009) (citing In re Personal Restraint of Metcalf, 92 Wn. App. 165, 178, 963 P.2d 911 (1998)), aff'd, 171 Wn.2d 455, 256 P.3d 328 (2011). "The inquiry begins with the fundamental question of legislative intent: has the Legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.' " Metcalf, 92 Wn. App. at 178 (internal quotation marks omitted) (quoting Hudson v. United States, 522 U.S. 93, 99, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997)).

The relevant statute, RCW 10.82.090, states simply that "restitution imposed in a judgment shall bear interest from the date of the judgment until payment, at the rate applicable to civil judgments." It is silent as to any specific intent relating to interest on restitution, save for the reference to what the interest rate should be, as set out in other statutes.[2]

---

[1] I concur with the majority's analysis under State v. Gunwall, 106 Wn.2d 54, 720 P.2d 808 (1986), determining that the federal and state excessive fines clauses are coextensive. Thus, this analysis proceeds under the Eighth Amendment.

[2] In turn, the statute regarding interest on civil judgments states, "The method for determining an interest rate prescribed by this subsection is also the method for determining the 'rate applicable to civil judgments' for purposes of RCW 10.82.090." RCW 4.56.110(6). That rate is "the maximum rate permitted under RCW 19.52.020 on the date of entry thereof." Id. The rate permitted by RCW 19.52.020 is the greater of 12 percent or four points above the 26-week treasury bill rate. RCW 19.52.020(1).

2

When a statute is ambiguous as to legislative intent, "[t]he title of a legislative act . . . may be referred to as a source of legislative intent." Covell v. City of Seattle, 127 Wn.2d 874, 887-88, 905 P.2d 324 (1995) (bill title's reference to "taxes" indicated legislature's intent to impose street utility charges under taxing authority, not under regulatory police power authority), abrogated on other grounds by Yim v. City of Seattle, 194 Wn.2d 682, 451 P.3d 694 (2019). In addition, courts may "look[] to legislative bill reports and analyses to discern the Legislature's intent." State v. Reding, 119 Wn.2d 685, 690, 835 P.2d 1019 (1992); Covell, 127 Wn.2d at 887 ("This court has sanctioned recourse to final legislative reports as an aid in determining legislative intent."); see also Snohomish County v. Pollution Control Hr'gs Bd., 187 Wn.2d 346, 363, 386 P.3d 1064 (2016) (courts may look to legislative history to discern legislative intent, relying on final bill report for vested rights statute). Courts have also examined testimony in legislative committee hearings to discern legislative intent. See, e.g., State v. Evans, 177 Wn.2d 186, 199-203, 298 P.3d 724 (2013) (citing recordings of committee hearings and floor debate to determine legislative intent); Cosmo. Eng'g Grp., Inc. v. Ondeo Degremont, Inc., 159 Wn.2d 292, 304, 149 P.3d 666 (2006) (reviewing recordings of committee hearings and floor debates to discern legislative intent).

Here, when the legislature enacted the provision imposing interest on restitution in 1989, the bill title was "AN ACT Relating to criminal procedure." LAWS OF 1989, ch. 276 pmbl. (Engrossed H.B. (EHB) 1070). The final bill report from EHB 1070 stated in a "background" section:

> The sentencing court may require a convicted defendant to pay restitution and may impose fines and penalties. Currently, no interest accrues on these monetary obligations. Civil judgments, on the other hand, accrue interest at the rate specified in the contract, if any, or at the maximum rate allowable under the state usury statute . . . .

FINAL B. REP. on EHB 1070, at 1, 51st Leg., Reg. Sess. (Wash. 1989). The "summary" section of the bill report then describes the bill's effect in relevant part: "[F]inancial obligations imposed by the court will bear interest until paid at the rate applicable to civil judgments." This legislative history thus shows that the legislature intended to impose interest on all "monetary obligations" without distinguishing between restitution and other "fines and penalties." "Fines and penalties" are typically punitive, as the plain language of the terms themselves suggests. See, e.g., Long, 198 Wn.2d at 164 (relying on the plain language meaning of the word "penalty" to find that one purpose of the ordinance at issue was to penalize violators).

Written testimony from the Washington Association of Prosecuting Attorneys (WAPA), which had also provided live testimony at the committee hearings in favor of the legislation, briefly addressed the portions of the bill addressing financial obligations.[3] According to WAPA, there was a "particular problem . . . with money judgments in criminal cases [including] judgments for restitution, court costs, recoupment for attorney fees, and fines"; defendants were

---

[3] Most of the discussion of the bill, including the live hearing testimony, was related to the bill's provisions modeled after the federal Bail Reform Act and addressed issues relating to people who had been convicted or pleaded guilty, but were released to the community pending their appeals. House Judiciary Comm. Hr'g (Wash. Jan. 25, 1989) (audio recording). The final bill reports from each chamber show that no one testified against the legislation, while several prosecutors and a representative of the Washington Bail Agents Association testified in favor. See S.B. REP. on EHB 1070 (as reported by Senate Committee on Law & Justice, March 28, 1989); H.B. REP. on EHB 1070 (as amended by the Senate) (as passed House March 7, 1989).

being allowed to wait until after an appeal was over to begin making payments, thus benefiting defendants and leaving victims waiting for payment "with no interest and with no assurance that they will ever be paid." WAPA, Legislative Recommendation re H.B. 1070 (S. Comm. on Law & Just. Bill File, H.B. 1070, 51st Leg. (1975)) (on file with Wash. State Archives). H.B. 1070 sought to remedy this problem with financial obligations in two ways: (1) allowing a stay only if the defendant posted a bond or made payments towards their obligations, as provided for civil judgments by RAP 8.1(b)(1) and (2) requiring monetary obligations to bear interest. Id. at 4-5. According to WAPA, the bill would "help ensure that neither victims nor the State will be injured by the delay in collecting the money due them." Id. at 4. WAPA also stated that imposing interest would "reduce the monetary benefit that defendants now receive by filing appeals, thereby delaying payment . . . [and] will also reduce the burden on victims who are forced to wait for their restitution payments." Id. at 5. Thus, the legislative history for the original legislation indicates that interest had a dual purpose of being remedial for victims and the State, and deterrent for debtors who could delay payment and benefit by filing appeals. A sanction that " 'cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment.' " Austin v. United States, 509 U.S. 602, 610, 113 S. Ct. 2801, 125 L. Ed. 2d 488 (1993) (emphasis added) (quoting United States v. Halper, 490 U.S. 435, 447, 448, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989)). Thus, the legislative history of RCW 10.82.090

5

brings it squarely into the ambit of the Eighth Amendment as determined by the United States Supreme Court.

Later statutory amendments similarly indicate a desire to retain interest specifically on restitution debt as a tool to ensure accountability for payment of restitution—i.e., as a punitive measure. In 2004, the legislature added a provision allowing courts to reduce interest on restitution "only if the principal has been paid in full," RCW 10.82.090(2)(b), indicating the purpose of imposing interest as an enforcement tool. Thus, even as the legislature created new mechanisms for courts to eliminate interest on nonrestitution debt accrued during incarceration, it limited courts' ability to reduce restitution interest. See LAWS OF 2011, ch. 106, § 1 (acknowledging the impact of interest on nonrestitution debt in creating "insurmountable debt" for people leaving prison)[4]; see also LAWS OF 2015, ch. 265 (eliminating most nonrestitution legal financial obligations for juveniles convicted of less serious crimes).

---

[4] Section 1 of this legislation described the purpose of the amendments:

(1) The legislature finds that it is in the interest of the public to promote the reintegration into society of individuals convicted of crimes. Research indicates that legal financial obligations may constitute a significant barrier to successful reintegration. The legislature further recognizes that the accrual of interest on nonrestitution debt during the term of incarceration results in many individuals leaving prison with insurmountable debt. These circumstances make it less likely that restitution will be paid in full and more likely that former offenders and their families will remain in poverty. In order to foster reintegration, this act creates a mechanism for courts to eliminate interest accrued on nonrestitution debt during incarceration and improves incentives for payment of legal financial obligations.

(2) At the same time, the legislature believes that payment of legal financial obligations is an important part of taking personal responsibility for one's actions. The legislature therefore, supports the efforts of county clerks in taking collection action against those who do not make a good faith effort to pay.

LAWS OF 2011, ch. 106, § 1.

The majority concludes that RCW 10.82.090's reference to the civil judgment statute to establish the interest rate demonstrates a legislative intent that interest is solely compensatory. The majority relies on civil case law, stating, "[i]n the civil context, the purpose of requiring any judgment debtor to pay interest on a judgment is to compensate the judgment creditor for the lost value of money," and "[i]nterest on civil judgments is not imposed as a punishment." Majority at 22 (citing Rufer v. Abbott Labs., 154 Wn.2d 530, 552, 114 P.3d 1182 (2005)). But this does not answer whether in the context of criminal restitution, interest amounts to punishment.

First, the underlying medical negligence and product liability claims in Rufer served exclusively compensatory purposes, 154 Wn.2d at 536, so it is unsurprising that the court concluded that interest on a purely compensatory judgment also served a compensatory purpose. The precise issue in Rufer was whether the court had the authority to relieve a party of postjudgment interest obligations. In stating that "[i]nterest is not imposed as a punishment," the court was distinguishing a situation in which a court imposes sanctions if a party's delay tactics are unreasonable or abusive. Id. at 553-54. Further, the fact that interest serves compensatory purposes in the civil context does not preclude interest from also serving other goals in the criminal context, including punitive goals such as deterrence. See, e.g., Austin, 509 U.S. at 610 ("sanctions frequently serve more than one purpose"). Ultimately, the discussion of interest in Rufer and other civil cases does not inform the fundamental question in analyzing whether the Eighth Amendment applies: whether the sanction—here,

7

interest on restitution imposed under RCW 10.82.090—solely serves a remedial

purpose or also serves punitive purposes. See Austin, 509 U.S. at 610.

Additionally, the purpose of the principal debt helps determine the purpose

of the interest.[5] The Supreme Court's decision in Long supports looking to the

context in which the initial principal cost is incurred to determine whether a cost

or fee is punitive.[6] In Long, the city impounded Long's truck pursuant to a

municipal ordinance prohibiting parking in one location for more than 72 hours.

He contested the impoundment and consequent charges of a $44 ticket, the

towing company's charges for towing and storing the vehicle, and an

administrative fee. 198 Wn.2d at 143. The city argued that the costs imposed on

Long as a result of the impoundment of his vehicle were remedial, not punitive,

because the city was merely recouping fees it had paid on Long's behalf. Id. at

163. The Long court rejected this argument, holding that "[t]he associated costs

were intended to reimburse the city for towing and storage fees, but they did not

exist in isolation. The fees were imposed *only as a result of* the impoundment,

---

[5] This approach is in fact consistent with the civil context, in which courts generally determine whether a party is entitled to interest by examining the nature of the principal. See, e.g., Hill v. Garda CL Nw., Inc., 191 Wn.2d 553, 576-77, 424 P.3d 207 (2018) (allowing recovery of prejudgment interest on compensatory portion of damages award in Minimum Wage Act case); Blake v. Grant, 65 Wn.2d 410, 413, 397 P.2d 843 (1964) ("interest is generally disallowed on punitive damages").

[6] The United States Supreme Court similarly has suggested in dicta that the context of a criminal proceeding matters and that restitution may be subject to the constitutional protections of the excessive fines clause; although paid to a victim, criminal restitution is "imposed by the Government 'at the culmination of a criminal proceeding and requires conviction of an underlying' crime." Paroline v. United States, 572 U.S. 434, 456, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014) (quoting United States v. Bajakajian, 524 U.S. 321, 321, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998)). The same analysis is true of interest on restitution: it is imposed by the government at the culmination of a criminal proceeding and requires conviction of an underlying crime. This is not to suggest, however, that outside the Eighth Amendment context, every consequence flowing from a criminal conviction is punishment, such as for the purpose of a defendant's right to a jury determination of an issue under Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

which [the ordinance] characterizes as a 'penalty.' " Long, 198 Wn.2d at 164 (emphasis added). Thus, the costs that flowed from the punitive impoundment were both remedial *and* punitive. Id.

Likewise, here, even if the interest is in part for the purpose of compensating the victim for the lost use value of the restitution award, the interest does not exist in isolation. Interest is imposed only as a result of the restitution award, which the majority has held to be at least partially punitive. Similarly, the interest that flows from the punitive restitution award can be both compensatory and punitive.

Finally, as additional evidence of compensatory purpose, the majority relies on the legislative purpose in allowing *restitution*, RCW 7.68.300, and not interest specifically. It also points to the statute that allows enforcement of *restitution* in the same way as for a civil judgment, RCW 9.94A.750(8). But these statutory provisions evince no specific intent relating to *interest* on restitution. Rather, if anything, these provisions reinforce the analysis that the legislature intended interest to have the same purposes and to be treated the same way as the restitution principal from which it flows.[7] And " '[i]t is commonly understood

---

[7] As the majority acknowledges, restitution is not necessarily or always entirely compensatory. Our Supreme Court has noted, "RCW 9.94A.753 allows the judge considerable discretion in determining restitution, which ranges from none (in some extraordinary circumstances) up to double the offender's gain or the victim's loss." State v. Kinneman, 155 Wn.2d 272, 282, 119 P.3d 350 (2005); see also RCW 9.94A.753(3) ("The amount of restitution shall not exceed double the amount of the offender's gain or the victim's loss from the commission of the crime."). Though we use a "categorical" rather than a "case-specific" approach to determine whether the Eighth Amendment applies, Austin, 509 U.S. at 619-22, were a trial court to exercise its statutory authority to impose *double* the amount of established loss in restitution, it would be difficult to justify the interest on the doubled portion of the award as anything but punitive.

that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties.' " Austin, 509 U.S. at 610 (quoting Halper, 490 U.S. at 447).

The statute requiring restitution awards to bear interest serves both punitive and compensatory purposes. "[A] statute only survives an excessive fines challenge if wholly remedial, without *any* punitive characteristics." State v. Tatum, __ Wn. App. 2d __, 768 n.2, 514 P.3d 763 (2022) (citing Long, 198 Wn.2d at 161). Also, because the restitution principal is partially punitive, so should be the interest deriving from that principal. Accordingly, I would hold that interest on restitution awards is subject to an excessive fines clause analysis under the Eighth Amendment and article I, § 14.

B. <u>Whether the imposition of interest is grossly disproportional to the crime</u>

If the interest on restitution is partially punitive, the Eighth Amendment then requires a determination of whether the imposition of interest is grossly disproportional to the crime that caused those losses. Ramos did not raise his challenge to interest under the excessive fines clause below, and the interest was imposed by automatic operation of RCW 10.82.090(1). Nevertheless, we may determine the constitutional issue de novo. "In applying this standard, the [trial] courts in the first instance, and the courts of appeals, reviewing the proportionality determination *de novo*, must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional."

No. 82818-5-I/11

<u>United States v. Bajakajian</u>, 524 U.S. 321, 336-37, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998) (footnote omitted).

Our Supreme Court has stated that to determine whether a penalty is grossly disproportional under the Eighth Amendment, the court must consider (1) the nature and extent of the crime; (2) whether the violation was related to other illegal activities; (3) the other penalties that may be imposed for the violation; (4) the extent of the harm caused; and (5) a person's ability to pay. <u>Long</u>, 198 Wn.2d at 173; <u>State v. Grocery Mfrs. Ass'n</u>, 198 Wn.2d 888, 899, 502 P.3d 806 (2022).

As to the nature and extent of the crime, Ramos was convicted of an undeniably serious and violent crime that caused extensive harm to the victims. The violation was not related to other illegal activities. There were other penalties that may be imposed for the violation: the statutory maximum for both felonies was life in prison and/or a fine of $50,000. Ramos was sentenced to 135 months on count 3 and 61 months on count 2, to run concurrently. As to the extent of the harm, Jarvis Capucion was gravely injured, was on life support for nearly three weeks, and suffered permanent damage, including removal of his spleen and injury to his arm.

Regarding the fifth factor, ability to pay, there was no specific inquiry at the resentencing, and there is no record of a payment plan. Nevertheless, the record shows that Ramos has no assets, income, or financial resources. He had appointed counsel at trial, and the trial court approved his proceeding on appeal in forma pauperis and with appointed counsel. Prior to Ramos's conviction, he was homeless; since his conviction in 2015, he has been incarcerated.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Because the court did not alter the original restitution amount from the original sentencing, starting from the entry of the original judgment and sentence, he had already accrued interest of $34,228.89 on the principal of $50,591.70, and had paid down only $781.55 of the principal in over five and a half years. His payments have averaged less than $12 per month. Even at a higher rate of $25 per month, it would take him over 168 years to pay off the principal and over approximately 1,875 years to pay off the principal plus interest. Until the principal decreases to the point at which Ramos is able to pay a minimum payment that equals 12 percent per year, the added interest will continue to outpace his ability to pay.

A rate of interest on the original principal that prevents Ramos from ever paying down the restitution principal is grossly disproportional. Such interest does not serve a legislative purpose to incentivize earlier payment of the principal amount, as it is unachievable for Ramos based on his current and future assets and earnings. Moreover, imposing this interest does not serve the purpose of compensating the judgment creditors for their lost use of the funds, when it instead prevents him from ever being able to pay them the principal.

The majority holds that when restitution is based on the victim's actual losses, it is inherently proportional to the crime, even if the defendant lacks the ability to pay. Majority at 25. But *interest* on restitution is different. Unlike restitution, interest is set at the same amount, 12 percent, regardless of the victim's actual losses, and bears no relation to the specific crime. More importantly, interest accrues only for people who cannot pay their debt. The

No. 82818-5-I/13

same restitution could be imposed on two different defendants for causing the same harm, but one with the ability to pay will never be charged interest, whereas the other will.[8] The result is that for those two individuals, the total amount owed, including interest, is not directly related to the crime. Thus, it cannot be said that interest is inherently proportional to the crime.

The Supreme Court recognized the centuries-old principle that underlies the excessive fines clause: " '[N]o man shall have a larger amercement imposed upon him, than his circumstances or personal estate will bear.' " Timbs v. Indiana, __ U.S. __, 139 S. Ct. 682, 688, 203 L. Ed. 2d 11 (2019) (alteration in original) (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES *372). That is precisely the effect of the statutory interest in Ramos's sentence. I would thus hold that the 12 percent interest imposed on Ramos's restitution obligation is grossly disproportional and violates the excessive fines clause.

_Chung, J._

---

[8] The disparate and harmful impact of legal financial obligations on people who lack the ability to pay has been well documented in Washington State. See, e.g., State v. Blazina, 182 Wn.2d 827, 836, 344 P.3d 680 (2015) ("indigent offenders owe higher LFO sums than their wealthier counterparts because they cannot afford to pay, which allows interest to accumulate and to increase the total amount that they owe" (citing KATHERINE A. BECKETT, ALEXES M. HARRIS & HEATHER EVANS, WASH. STATE MINORITY & JUSTICE COMM'N, THE ASSESSMENT AND CONSEQUENCES OF LEGAL FINANCIAL OBLIGATIONS IN WASHINGTON STATE (2008) (Wash. State Minority & Just. Comm'n), http://www.courts.wa.gov/committee/pdf/2008LFO_report.pdf)); State v. Gaines, 16 Wn. App. 2d 52, 61, 479 P.3d 735 (2021) (Worswick, J., concurring) (expressing concern over court cost collection practices and their effects on indigent defendants (citing Bryan L. Adamson, Debt Bondage: How Private Collection Agencies Keep the Formerly Incarcerated Tethered to the Criminal Justice System, 15 Nw. J.L. & Soc. Pol'y 305, 318 (2020))); MINORITY & JUST. COMM'N, WASH. STATE SUP. CT., THE PRICE OF JUSTICE: LEGAL FINANCIAL OBLIGATIONS IN WASHINGTON STATE (2022), https://www.courts.wa.gov/subsite/mjc/docs/MJC_LFO_Price_of_Justice_Report_Final.pdf; Maria Katarina E. Rafael & Chris Mai, Understanding the Burden of Legal Financial Obligations on Indigent Washingtonians, 11 SOC. SCIS. art. 17 (2022) https://doi.org/10.3390/socsci11010017.

13